RECEIVED
IN ALEXANDRIA, LA.
SEP 0 1 2009
TONY R. MOORE, CLERK
BY_____ DEPUTY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

| A.J. FOWLER AND BLANCHE FOWLER | CIVIL ACTION NO. 08-216 |
|---|---|
| VERSUS | JUDGE TRIMBLE |
| UNITED STATES OF AMERICA | MAGISTRATE JUDGE KIRK |

## MEMORANDUM RULING

The above captioned case was tried before the undersigned on June 17 – 18, 2009 at the U.S. District Court in Alexandria, Louisiana. At the close of evidence, the parties were instructed to file post-trial briefs and simultaneous rebuttals within specified delays. Having timely received all such briefs, the matter is now before the court for decision.

As explained below, it is the finding of this court that plaintiffs did not produce evidence sufficient to demonstrate that the disallowance of certain Schedule F losses and subsequent tax assessment of the Commissioner was erroneous. Accordingly, we do not find that plaintiff is entitled to a refund of any such assessment, with the exception of $38,713.59, representing the amount previously abated by the government, as to which we find that government waived its variance doctrine argument by actual knowledge of such claim.

I.  **BACKGROUND**

*Relevant Facts*

Plaintiffs A.J. and Blanche Fowler filed the above captioned suit on February 12, 2008 seeking a refund of federal income tax, as well as all interests and penalties thereon. Specifically, plaintiffs sought refund of additional taxes assessed against them as a result of an

1

audit by the Internal Revenue Service concerning their 2000, 2001 and 2002 federal income tax returns.

The Commissioner's additional tax assessment was based on a finding that, during the three years at issue in this case, plaintiffs were not engaged in soybean farming for profit within the meaning of the Internal Revenue Code and, accordingly, certain Schedule F losses related to that purported farming operation were not allowable on plaintiffs' 2000, 2001 and 2002 tax returns. Plaintiffs paid the additional assessments, along with penalties and interest thereon for each of the years at issue and subsequently filed requests for refunds of portions of the additional taxes paid. Each of these refund requests were denied, giving rise to this court's jurisdiction over plaintiffs' refund claims under 28 U.S.C. § 1346(a)(1) and 26 U.S.C. § 7422(a).

*Applicable Standard*

Sections 162(a), 212(1) and 212(2) of the Internal Revenue Code ("IRC") permit the deduction of ordinary and necessary expenses incurred in a trade or business, the production or collection of income or the maintenance of property held for the production of income. Section 183 permits the deduction of certain expenses incurred during the course of activity not engaged in for purpose of producing or collecting income or, in other words, not for profit. Section 183 does not permit the deduction of losses sustained in activities not undertaken for profit.

Treasury Regulations promulgated under Section 183 provide that a determination as to whether or not a taxpayer engaged in activity for profit must be made "...by reference to objective standards, taking into account all of the facts and circumstances of each case."[1] These regulations further provide nine (9) factors which should be considered when determining the taxpayer's intent to make a profit. They are:

---

[1] 26 C.F.R. § 1.183-2(a).

2

(1) the extent to which the taxpayer carries out the activity in a businesslike manner;
(2) the expertise of the taxpayer or his advisors;
(3) the time and effort expended by the taxpayer in carrying out the activity;
(4) the expectation that assets used in the activity may appreciate in value;
(5) the success of the taxpayer in other similar or dissimilar acivities;
(6) the taxpayer's history of income or losses attributable to the activity;
(7) the amount of occasional profits, if any, which are earned;
(8) the taxpayer's financial status; and
(9) any elements of personal pleasure or recreation in the activity.[2]

"These factors are not exclusive, and no one factor or mathematical preponderance of factors is determinative."[3]

A determination of tax deficiency by the Commissioner of Internal Revenue is presumed to be correct and, thus, the taxpayer challenging the deficiency bears the burden of proving it wrong.[4] The burden of proof shifts to the government only after the taxpayer

(1) presents credible evidence with respect to a factual issue;
(2) has maintained records as required by the Internal Revenue Code; and
(3) has cooperated with reasonable requests by the Secretary for witnesses, information, documents, meetings and interviews.[5]

Moreover, the taxpayer bears the burden of proving the specific amount of refund he is entitled to recover.[6] It is insufficient to simply prove that the assessment was erroneous in some way.[7]

---

[2] 26 C.F.R. § 1.183-2(b)(1)-(9).
[3] Westrbook v. Commissioner, 68 F.3d 868, 876 (5th Cir. 1995) (citing Faulconer v. Commissioner, 748 F.2d 890, 894 (4th Cir. 1984), Nickerson v. Commissioner, 700 F.2d 402, 404-05 (7th Cir. 1983)).
[44] U.S. v. Janis, 428 U.S. 433 (1976).
[5] 26 U.S.C. § 7491(1).
[6] Janis, 428 U.S. at 440 (citing Lewis v. Reynolds, 284 U.S. 281 (1932)).
[7] Id.

## II. ANALYSIS

**Factor one: the extent to which the taxpayer carries out the activity in a businesslike manner**

In assessing the evidence before us under this first factor, we must consider whether the taxpayer maintained complete and accurate books and records, whether or not the taxpayer conducted the activity in a manner substantially similar to other activities of the same nature which are profitable and whether or not the taxpayer abandoned unprofitable methods or adopted new techniques or operating methods during the conduct of the activity at issue.[8]

### Complete and Accurate Books and Records

The court heard testimony from A.J. Fowler and his bookkeeper, Ms. Willard, stating that plaintiffs maintained complete and accurate records, but that all such records pertaining to the years at issue were lost in Hurricane Gustav during 2008.[9] Additional electronic data was lost when a computer used by Willard "crashed" in 2008.[10]

As we have explained above, plaintiffs' refund suit is a de novo proceeding in which this court is required to determine whether or not plaintiffs engaged in soybean farming for profit and are, thus, entitled to a refund of certain federal income tax paid. Plaintiffs filed this suit in 2008 and, despite the heavy burden under which they bring their claims, made very little effort to present the court with reconstructed financial records, invoices and other documents which would tend to demonstrate businesslike recordkeeping.

Although we do not doubt the authenticity of the scant records produced by plaintiffs,[11] the court is dismayed at plaintiffs' seeming lack of effort in reconstructing any of their financial

---

[8] 26 C.F.R. § 1.183-2(b)(1).
[9] Tr. 18:21-19:12, 202:16-213:17.
[10] Tr. 218:8-17.
[11] Plaintiffs' Exhibits 7, 8, 9, 10, 12, 13, 14, 26, 27, 29.

4

records for these litigation purposes, especially in light of the substantial burden which they bear in asserting refund claims.[12] 2000, 2001 and 2002 bank records, for example, would likely have been easily obtained from plaintiffs' bank, but, for reasons still unknown to this court, were not requested.

In determining whether or not a taxpayer engaged in an activity for profit, the taxpayer's own self-serving statements will be afforded little weight, for obvious reasons.[13] Plaintiffs' testimony and that of his bookkeeper do not constitute a preponderance of evidence when weighed against the absence of a reasonable volume of financial records to substantiate normal businesslike accounting practices. We reject plaintiffs' argument that, given their cooperation with the IRS audit, it should be taken as true that complete and accurate records were kept. The purpose of the audit was not to verify whether or not formal records were kept, although Mr. McNeely the examining agent testified that such records were not kept,[14] but to determine whether or not plaintiffs engaged in farming for profit. Again, plaintiff must demonstrate businesslike conduct by a preponderance of the evidence in this de novo proceeding.[15]

### Conduct of the Activity in Manner Substantially Similar to Other Similar Profitable Activities

The parties agree that the optimal window for planting soybeans in plaintiffs' location is May 15 through June 15 of each year. A.J. Fowler testified that it was too wet to plant his farm

---

[12] Priestly v. C.I.R., T.C.Memo. 2003-267, 2003 WL 22100683 (U.S. Tax Ct. 2003) (citing Malinowski v. Commissioner, 71 T.C. 1120, 1124-25, 1979 WL 3606 (1979) and Villareal v. Commissioner, T.C. Memo. 1998-420.
[13] Nickerson, 700 F.2d at 404) ("A taxpayer claiming a deduction on a Federal income tax return must demonstrate that the deduction is allowable purusuant to some statutory provision and must further substantiate that the expense to which the deduction relates has been paid or incurred...A taxpayer's obligation to substantiate a claimed deduction is not eliminated merely because the taxpayer's records have been lost, stolen, destroyed, or otherwise made unavailable to the taxpayer...we expect the taxpayer to make some attempt to obtain substantiating records from third parties in those situations where it is reasonable to expect that third party records exist.").
[14] Tr. 351 – 353.
[15] Carson v. U.S., 560 F.2d 693 (5th Cir. 1977).

during the optimal window in both 2000[16] and 2001[17] and too dry to plant during the optimal window in 2002.[18] Plaintiffs claim that the weather during those three years made planting impossible and, as such, they really made no "decision" not to plant. A.J. Fowler testified that the weather made that decision for them.[19]

The court heard testimony from several area farmers, including Gary Morgan, plaintiffs' crop insurance agent, who said that he managed to plant soybeans on his "alligator clay" farm during two of the three years in question. Morgan affirmed that the soil attributes of his farm are similar to plaintiffs' Moreland clay soil.[20]

The court also heard testimony from plaintiffs' adjacent neighbors, John and Herman Chop, whose land consists primarily of Moreland clay, who were able to plant soybeans during each of the three years at issue.[21] Herman Chop testified that he had never made the decision not to plant because of weather, although he may have planted late.[22]

Craig McCain, County Executive Director for the Farm Service Agency, testified that "[p]revented planting is...very unusual. It's not unheard of, but it's not a normal thing."[23]

A.J. Fowler testified that he planted soybeans after June 15 in the year 2000 and that crop failed.[24] Prior to planting this crop, evidence suggests that plaintiff filed a prevented planting claim with the United States Department of Agriculture ("USDA") in 2000 and that this claim was denied by the USDA County Committee on the basis that that plaintiffs had never reported

---

[16] Tr. 48:6-11.
[17] Tr. 59:18-20.
[18] Tr. 66:16-17.
[19] Tr. 109:5-11.
[20] Tr. 230-233.
[21] Tr. 399:13-14, 399:18 - 400:8; 413:23-24, 415:8-21.
[22] Tr. 413:2-4.
[23] Tr. 440:21-23.
[24] Tr. 51:20 – 52:19.

their acreage (a prerequisite to a prevented planting claim) and that plaintiffs' account of their inability to plant was not credible to the Committee, who noted that:

> [d]uring the time period 1993 through 2002 this farm has no report of planted acreage and to the Committee's knowledge, the operator has not intended to plant crops for harvest.
>
> During the 2000 crop year other producers in the area surrounding this farm planted their crops...The Committee was concerned that this farm is made up of almost 2000 acres and none of the acreage was planted. The COC felt that if this farm did experience adverse weather conditions, these weather conditions would not have affected the entire farm acreage during the entire planting season...in a way that would have prevented the planting of the entire farm.[25]

On the basis of the foregoing testimony and evidence, the court cannot find that plaintiffs engaged in soybean farming in a manner substantially similar to that of other similarly situated soybean farmers. The weight of the evidence before us indicates that plaintiffs' decision not to plant in the three years in question was contrary to the practices of those who farmed profitably near them and on similar soil.

### Abandonment of Unprofitable Methods or Adoption of New Techniques

Evidence that the taxpayer abandoned unprofitable methods or adopted new techniques is consistent with an intent to improve profitability.[26] Plaintiffs produced no evidence that, despite years of losses due to failure to plant a crop, they abandoned any of their unprofitable methods or adopted any new techniques in pursuit of profit. Plaintiffs did not switch to an alternate crop.[27] Plaintiffs did not report their acreage in order to become eligible for USDA programs which are

---

[25] Government Exhibit 55.
[26] 26 C.F.R. § 1.183-2(b)(1).
[27] Tr. 108:2-14.

7

available to farmers who suffer crop failures.[28] Plaintiffs did not trigger the attachment of crop insurance by actually planting.[29] Further, it appears that plaintiffs did not rent their unprofitable land to tenant farmers until after their audit and subsequent Schedule F disallowance by the IRS. In short, the evidence before this court does not demonstrate the pursuit of profit, but, rather, an indifference to it.

### Factor two: the expertise of the taxpayers and their advisors

The court finds that plaintiffs introduced ample evidence that plaintiff A.J. Fowler is knowledgeable on the subject of soybean farming. The court is convinced that, despite his varied career paths, he possesses the requisite understanding of farming practices to farm soybeans for profit, if he chose to do so.

### Factor three: the time and effort expended by the taxpayers in carrying on the activity

A.J. Fowler testified that, during each of the three years in question, he prepared his fields for planting by chopping, dragging, rowing and leveling them.[30] He estimated that this process took approximately one month.[31] He estimated that planting his 2000 acres with soybeans would take approximately fifteen (15) days.[32]

Apart from these general estimates, plaintiffs presented no evidence of substantial amounts of time spent tending to the farm. Given that soybeans were certainly not planted in 2001 or 2002, we find that plaintiffs have not demonstrated a substantial time commitment to the operation of their farm during the majority of the years in question. The court also notes that tax

---

[28] Tr. 88:20 – 89:21.
[29] Tr. 264:1-13.
[30] Tr. 41-44.
[31] Tr. 382:17-20.
[32] Tr. 111:6-8.

8

returns for the years in question do not list any labor costs, foreclosing the argument that plaintiffs, now in their seventies, procured help from outside sources to manage farm operations.[33]

**Factor four: expectation that the assets used in the activity will appreciate in value**

Plaintiffs assert that, in addition to the motive of farming for profit, they purchased their substantial land holdings with the motive of owning an asset that will increase in value.[34] Treasury Regulation 1.183-2(b)(4) provides that the taxpayer may expect

> ...an overall profit will result when appreciation in the value of land used in the activity is realized since income from the activity together with the appreciation of land will exceed expenses of operation.[35]

However, Treasury Regulation 1.183-1(d)(1) provides that

> [w]here land is purchased or held primarily with the intent to profit from increase in its value, and the taxpayer also engages in farming on such land, the farming and the holding of the land will ordinarily be considered a single activity only if the farming activity reduces the net cost of carrying the land for its appreciation in value. **Thus, the farming and holding of the land will be considered a single activity only if the income derived from farming exceeds the deductions attributable to the farming activity which are not directly attributable to the holding of the land** (that is, deductions other than those directly attributable to the holding of the land such as interest on a mortgage secured by the land, annual property taxes attributable to the land and improvements, and depreciation of improvements to the land).[36]

Plaintiffs presented relatively little evidence concerning the value of their 2000 acres of farmland. A.J. Fowler testified that he inherited about 250 acres from his parents and, thereafter,

---

[33] Government Exhibits 6-8, 10-13.
[34] Tr. 79:11-15.
[35] 26 C.F.R. § 1.183-2(b)(4).
[36] 26 C.F.R. § 1.183-1(d)(1) (emphasis added).

began to buy all the land he could get.[37] Although plaintiffs provided no documentation in support of this fact, A.J. Fowler testified that he paid an average of $300 per acre.[38]

A.J. Fowler engaged the services of Dewey Holsomback, an area real estate professional, to render a broker's price opinion. Mr. Holsomback testified that a broker's price opinion is not an appraisal and stated that he offered no opinion as to the current value of plaintiffs' land.[39] The broker's price opinion states that plaintiffs' woodland is worth approximately $1100 per acre; plaintiffs' farmland is worth approximately $2000 per acre and plaintiffs' land fronting Highway 71 is worth approximately $5000 per acre.[40]

Based on this evidence plaintiffs assert that their land has increased in value since they acquired it and that this is evidence of profit motive. The court disagrees. As cited above, we may only consider appreciation of farmland value as evidence of profit motive when the income derived from farming is greater than the costs of owning and maintaining the land.[41] Such a conclusion is not supported by the facts in this case, as plaintiffs made virtually no profit from their farming operations during the last decade and have, during the three years at issue in this case, reported substantial losses on the same. Thus, we reject plaintiffs' argument that they have demonstrated asset value appreciation as evidence of profit motive.

**Factor five: the taxpayers' success in similar or dissimilar activities**

Evidence that the taxpayers engaged in similar activities in the past and converted them from unprofitable to profitable enterprises may indicate a profit motive, even though the activity at issue is currently unprofitable.[42]

---

[37] Tr. 78:13-25.
[38] Tr. 79:4-10.
[39] Tr. 311:22-24.
[40] Plaintiffs' Exhibit 4.
[41] Westbrook, 68 F.3d at 877.
[42] 26 C.F.R. 1.183-2(b)(5).

A.J. Fowler testified that, at one time, he operated a profitable corporation which sought government contracts to cut, bale and haul hay from U.S. military facilities.[43] Additionally, he testified that he operated a government contract refuse removal business which was unprofitable.[44]

The court does not find that plaintiffs' purported success in the business of cutting, baling and hauling hay per government contract is convincing evidence of profit motive in this case. As recited throughout this opinion, plaintiffs must prove, by a preponderance of the evidence, that they farmed soybeans for profit. Plaintiffs' own self-serving testimony is simply insufficient to establish this element of profit motive.

### Factor six: the taxpayers' history of income or losses with respect to the activity at issue

Treasury Regulation 1.183-2(b)(6) provides that losses sustained beyond the traditional start-up period which are unexplained may be indicative that the activity is not engaged in for profit. However, losses sustained due to "fortuitous circumstances" such as "drought, disease, fire, theft, weather damages" are not considered an indication against profit motive.

Plaintiffs assert that they were prevented from planting during the optimum window in 2000, 2001 and 2002 by weather conditions which constitute "fortuitous circumstances" beyond their control. The court finds that evidence of plaintiffs' earnings from soybean farming dating back to 1999 indicates that plaintiffs' claims are not credible. Plaintiffs reported only two years of crop sales during these last ten (10) years.[45] Indeed, the majority of income from the farm was derived from the lease of the property beginning in 2004.[46]

---

[43] Tr. 103: 12-13; 375:11-19;
[44] Tr. 103:10-11.
[45] Government Exhibits 1-15.
[46] Id.

As cited above, the evidence before us indicates that other nearby farmers did not experience the same disastrous conditions and managed to plant and harvest soybeans more often than not. Thus, plaintiffs have failed to demonstrate that they have a history of income or losses which weighs in favor or, at least, does not weigh against profit motive in this case.

**Factor seven: the amount of occasional profits, if any, earned by taxpayers**

Plaintiffs admit that their farm was not profitable during the years at issue in this case. The court acknowledges that farming of any sort presents a risk which makes it somewhat speculative, but we reject the contention that plaintiffs' lack of profits are due solely to these common risks. Evidence before the court reveals that plaintiffs have only planted soybeans once or twice within the last two decades. Failure to plant will always result in a lack of profit. No speculation is required to predict this outcome. Plaintiffs ensured their losses by failing to plant. This type of decision is not a "business decision" not to be second-guessed as argued by plaintiffs. Repeated election against planting is the decision not to be in business of farming.

A.J. Fowler testified that he would not plant unless he felt that he could make a good crop and, moreover, would not participate in "government farming" by applying for USDA subsidy programs. This court makes no judgment on the prudence of the existence of these programs, but notes that these programs are lawful avenues to mitigate risk in farming. The widespread participation of similarly situated farmers in plaintiffs' area tends to demonstrate that participation is advisable if profit is the motive.

**Factor eight: the financial status of the taxpayers**

Treasury Regulation 1.183-2(b)(8) provides that "the fact that the taxpayer does not have substantial income or capital from sources other than the activity may indicate that an activity is

engaged in for profit." Plaintiffs received more than $100,000 in interest income in each of the years at issue, in addition to dividend income, social security benefits and pension payments.[47] Thus, plaintiffs have significant income from sources other than soybean farming.

The evidence before the court indicates that plaintiffs reported substantial Schedule F losses, despite engaging in little or no actual farming, in order to create a tax shelter for their significant income. We reject plaintiffs' argument that the government is too late in asserting tax shelter theory as plaintiffs' motivation in this case. In Nickerson v. Commissioner of Internal Revenue,[48] the Seventh Circuit Court of Appeals cited the recognition by Congress that wealthy individuals may invest in farming in order to hide taxable income from the IRS, incurring "paper losses" and that these individuals have "a remarkable propensity to lose money in the farm business." Thus, from the inception of Section 183, the taking of farm losses as a tax shelter has been a consideration. The overwhelming weight of the evidence before this court indicates that plaintiffs engaged in just such an activity.

**Factor nine: elements of personal pleasure or recreation**

Plaintiffs cite Nickerson for their contention that they engaged in strenuous physical labor in order to prepare their 2000 acre farm for planting in the years 2000, 2001 and 2002 and that it is against logic to assume that they would expend this great effort for pleasure, rather than for profit. As explained above, we do not find that plaintiffs were motivated by hobby, recreation or personal pleasure. We instead find that they were motivated by a desire to shelter their income from federal income tax liability.

---

[47] Government Exhibits 7-9.
[48] 700 F.2d at 405 (citing S. Rep. No. 91-552, 91st Cong., 1st Sess., reprinted in 1969 U.S. Code Cong. & Ad. News 2027, 2376).

13

We similarly reject plaintiffs' argument that common sense dictates that plaintiffs would not incur substantial expense just to save a lesser amount in tax liability. As expressed numerous times throughout this opinion, plaintiffs produced almost no evidence of the expenses claimed and it is their burden to do so in this de novo proceeding. Given the lack of evidence of expenses before us, we cannot find that these funds were expended and, thus, cannot find that plaintiffs carried their burden of proof with respect to this element.

**Abatement of Tax**

Plaintiffs assert that a portion of their income tax liability was erroneously abated by the government in on August 15, 2005 in the amount of $36,242 and $7,020.44 in interest. Plaintiffs further assert that the IRS sent them a refund check in the amount of $38,713.59 which the IRS later informed him was in error.[49] Plaintiffs returned the funds to the government.[50] Plaintiffs argue that the government failed to reinstate the tax, previously abated in error, before the statute of limitations to do so expired on September 12, 2005. Accordingly, plaintiffs assert that they are entitled to a refund of this particular amount, regardless of the court's finding as to the remainder of their refund claims.

The government argues that plaintiffs failed to raise this issue at the administrative level and, thus, this court is without jurisdiction to review such claim pursuant to 26 U.S.C. § 7422(a). Having raised the issue for the first time in their pretrial memorandum, filed thirty (30) days before trial, the government asserts that such claims is improper at this time.

Plaintiffs answer by pointing out that the variance doctrine, asserted as a jurisdictional bar in this case, can be waived by the government and jurisdiction is present when the IRS had knowledge of the existence of the claim during the administrative process. Plaintiffs argue that

---

[49] Tr. 145-146.
[50] Id.

the IRS documents introduced at trial verify that that the government had notice of the erroneous abatement and, contrary to the advice of its internal counsel, attempted to reinstate the tax after the statute of limitations expired.[51]

The court has carefully reviewed the documents filed into evidence and the briefs of the parties on this issue and finds that the erroneous abatement of tax is not a separate claim from the erroneous disallowance claims advanced by plaintiff in this suit. The tax abated is a portion of the year 2000 taxes which are the subject of plaintiffs' suit. The evidence before the court, most notably the Reinstatement of Erroneously Abated Tax Lead Sheet,[52] demonstrates that the IRS was fully aware of the error and of the expiration of the applicable statute of limitations in this case. We find that the government waived its variance doctrine argument by notice of the erroneous abatement and that, accordingly, plaintiff is entitled to assert such a claim before this court under the rulings of the U.S. Supreme Court in United States v. Memphis Cotton Oil Co.[53] and Angelus Milling Co. v. C.I.R.[54]

**Admissibility of Expert Testimony by Dr. Kelly Bryant**

The government retained Dr. Kelly Bryant, an agricultural economist, to render an opinion as to how many days during the soybean planting window would have been suitable for field work during 2000, 2001 and 2002. Dr. Bryant arrived at his conclusion by asking a former colleague, Dr. Jimmy Williams, to run the Erosion Productivity Impact Calculator ("EPIC"). Dr. Williams is the originator of this computer generated mathematical model and, not having worked with EPIC for several years, Dr. Bryant felt that Dr. Williams would be more qualified to

---

[51] Plaintiffs' Exhibits 31, 32.
[52] R. 31.
[53] 288 U.S. 62 (1933).
[54] 325 U.S. 293 (1945).

run the model.[55] Dr. Bryant's original report was the result of plugging in daily rainfall and temperature data, taken at the Dean Lee Research Station at Louisiana State University at Alexandria, Louisiana. On March 31, 2009 Dr. Bryant issued his initial report which included the finding that

> [f]or the year 2000, 28 days from May 15 to June 15 met the criteria for being suitable for field work. For 2001, 20 days from May 15 to June 15 met the criteria for being suitable for field work[56]

Dr. Bryant also concluded that, in 2002, the soil was dry, but that in late June, the moisture recovered and stayed above the wilting point for all but two days, indicating that, had plaintiffs planted soybeans, they "would have likely established a stand of soybeans and faired the same as other soybean farmers in the parish..."[57]

On May 21, 2009 Dr. Bryant issued a supplemental report after reviewing the EPIC calculation results and suspecting that, due to the volume of rainfall in 2000 and 2001, they were inaccurate. Dr. Bryant reported his suspicions to Dr. Williams and asked him to make the necessary corrections to achieve a more accurate result. Dr. Bryant's supplemental report concluded that

> [f]or the year 2000, 10 days from May 15 to June 15 met the criteria for being suitable for field work...For 2001, 6 days from May 15 to June 15 met the criteria for being suitable for field work...Based on this information, [plaintiffs] had sufficient days between May 15 and June 15 when the soil was dry enough to plant over half the farm in 2000 and less than half the farm in 2001.

---

[55] Tr. 163:14-21.
[56] R. 33-4 at p. 2.
[57] Id.

Plaintiffs filed a motion in limine[58] to exclude Dr. Bryant's report and testimony thereon from consideration at the trial of this matter. Plaintiffs assert that two defects are present in Dr. Bryant's reports: first that Dr. Williams is really the expert on this subject and Dr. Bryant should not be allowed to act as a mouthpiece for another expert and second, that EPIC has not been used to determine days suitable for field work in the past and, thus, has not been peer reviewed for this purpose. Plaintiffs assert that Dr. Byrant's testimony is, thus, unreliable and improper. The court agrees.

It is clear to the court that Dr. Williams, the originator and operator of the EPIC program, is the expert who is qualified to testify about the results derived from EPIC, not Dr. Bryant. The error in EPIC's first results, for example, was corrected by a mathematical adjustment which was performed by Dr. Williams, not Dr. Byrant. The methods and calculations used by Dr. Williams are not accessible to the court for purposes of verification and, thus, Dr. Williams is not merely a "gopher" or "assistant,"[59] but an independent expert. Further, given the obvious error in EPIC's original results in this case and the admitted lack of peer review[60] for its use in determining suitable field days, the court is not satisfied as to the reliability of the model for that use under Fed. R. Evid. 702.

Given our finding that the government has not demonstrated the reliability of Dr. Bryant's expert opinion based on the EPIC model, we find that such evidence is inadmissible under Fed. R. Evid. 401 and 702. Accordingly, we find that plaintiffs' motion in limine should be granted in full. As evidenced by our ruling above, the court did not rely upon Dr. Bryant's expert reports or testimony in deciding the merits of this case.

---

[58] R. 56.
[59] It is well settled that an expert may rely on the work of assistants when formulating an expert opinion, but may not simply parrot the work actually done by another expert, who is not offered for testimony and cross-examination. Dura Automotive Systems of Indiana, Inc v. CTS Corp., 285 F.3d 609 (7th Cir. 2002).
[60] Tr. 182:8-12.

## III. CONCLUSION

It is the finding of this court that plaintiffs have not presented evidence sufficient to demonstrate that the disallowance of certain Schedule F losses and subsequent additional tax assessment was in error. Instead, the evidence before the court demonstrates that plaintiffs were not engaged in soybean farming for profit under applicable law and jurisprudence during the years 2000, 2001 and 2002. Voluminous evidence submitted by the government leads this court to conclude that plaintiffs elected not to plant soybeans during those years, as they had during numerous years before, in order to shelter substantial income from other sources from federal income tax liability.

This court also finds that the government waived its variance doctrine argument, having had full knowledge of it erroneous abatement of taxes and the expiration of the statute of limitations for reinstating the same. Accordingly, we find that plaintiffs are entitled to a refund in the amount of $38,713.59, representing the amount abated by the government.

**September 1, 2009**

/JAMES T. TRIMBLE, JR.
UNITED STATES DISTRICT JUDGE